**[J-15-2021] [MO: Saylor, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 49 MAP 2020 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at 720 MDA 2019 |
| | : | dated January 10, 2020 Affirming |
| v. | : | Judgment of Sentence of the |
| | : | Lycoming County Court of Common |
| | : | Pleas, Criminal Division, at No. CP- |
| JORDAN ADONIS RAWLS, | : | 41-CR-89-2017 dated April 5, 2019 |
| | : | |
| Appellant | : | ARGUED: March 10, 2021 |

**DISSENTING OPINION**

**JUSTICE WECHT**                                              **DECIDED: August 17, 2021**

In this matter of first impression, today's Majority concludes that law enforcement agents need not apprise an arrestee that they already have charged him with the crime under investigation in order to secure from him a "knowing and intelligent" waiver of his Sixth Amendment right to counsel prior to a custodial interrogation about that crime. I believe that the interrogator's failure to advise Jordan Rawls that he formally had been named as a defendant in a criminal prosecution violated the Commonwealth's duty to make Rawls aware of the "full dangers and disadvantages of self-representation." *Patterson v. Illinois*, 487 U.S. 285, 299-300 (1988) (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)). Accordingly, I dissent.

The Sixth Amendment to the United States Constitution commands that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. Among the "immutable principles of

justice which inhere in the very idea of free government," the right to counsel guaranteed by the Sixth Amendment is "a necessary requisite of due process of law." *Powell v. Alabama*, 287 U.S. 45, 71 (1932) (quoting *Holden v. Hardy*, 169 U.S. 366, 389 (1898)). The Supreme Court of the United States has characterized the right to counsel as one of "the fundamental safeguards of liberty" enshrined in the Bill of Rights, applicable to the States pursuant to the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 341 (1963). At its core, "[t]he purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938). Consequently, the right is "indispensable to the fair administration of our adversary system of criminal justice." *Brewer v. Williams*, 430 U.S. 387, 398 (1977).

It is well-settled that "the right to counsel attaches at the initiation of adversary judicial criminal proceedings," *United States v. Gouveia*, 467 U.S. 180, 189 (1984), "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality). Because "the government has committed itself to prosecute" at that point, solidifying its adverse position vis-à-vis the accused, *id.*, a defendant is entitled to the assistance of counsel during all "critical stages" of the prosecution, *United States v. Wade*, 388 U.S. 218, 227 (1967), including custodial interrogations that are conducted by law enforcement after the arrestee formally has been charged with the crimes under investigation. *Patterson*, 487 U.S. at 290. "The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution." *Wade*, 388 U.S. at 227.

Moreover, once charged with a crime, a defendant need not expressly invoke his Sixth Amendment right to counsel in order to secure its protections. *Carnley v. Cochran*, 369 U.S. 506, 513 (1962). Notwithstanding this automatic conferral, as with other constitutional rights, a defendant may waive the Sixth Amendment's prohibitions against uncounseled, post-charging questioning by police. *Id.* However, any such relinquishment must be "voluntary, knowing, and intelligent," *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009), which the government bears the burden of proving. *Patterson*, 487 U.S. at 293. "The determination of whether there has been an intelligent waiver of [the] right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464.

This case raises the question of whether a waiver constitutionally is valid when investigators withhold from an arrestee the critical fact that he already has been charged with a crime prior to a custodial interrogation regarding that offense. To that end, this Court must decide what quantum of information must be provided to the arrestee under these circumstances so that a subsequent waiver by that individual of his Sixth Amendment right to counsel can be deemed "knowing" and "intelligent." The Majority concludes that the government need not inform the arrestee that he has been charged as a prerequisite to a valid waiver. The principles cited above compel me to disagree.

The Majority, on the other hand, relies principally upon the Supreme Court's observation in *Patterson* that, "[a]s a general matter, . . . an accused who is admonished

with the warnings prescribed" in *Miranda v. Arizona*, 384 U.S. 436 (1966)[1], "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296; *accord Commonwealth v. Woodard*, 129 A.3d 480, 500-01 (Pa. 2015). Although *Patterson*'s general rule undoubtedly would apply to the vast majority of pre-trial Sixth Amendment waiver cases, the Supreme Court expressly refused to consider whether that rule applied to the particular circumstances at issue here—*i.e.*, whether a defendant who is unaware that he formally has been charged with a crime is in the same position to make a knowing and intelligent waiver as a defendant who had been so informed, *ceteris paribus*. Because Patterson conceded that the police had informed him of his indictment on murder charges before he waived his *Miranda* rights and submitted to their questioning, the Court declined to "address the question whether or not an accused must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid." *Patterson*, 487 U.S. at 295 n.8.

Although the Court referred skeptically to "the desirability of so informing the accused," *id.*, it did so in reference to a line of authority arising from the United States Court of Appeals for the Second Circuit, culminating with *United States v. Mohabir*, 624 F.2d 1140 (2d Cir. 1980), which established unprecedented procedures for testing

---

[1]    *Miranda*, of course, mandates that law enforcement adhere to certain safeguards before initiating a custodial interrogation. In order to protect an individual's Fifth Amendment privilege against compulsory self-incrimination, *Miranda* requires that, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

the validity of Sixth Amendment waivers. *See, e.g.*, *Carvey v. LeFevre*, 611 F.2d 19, 22 (2d Cir. 1979) (holding that post-indictment statements that complied with *Miranda* but were not preceded by any indication to the defendant that an indictment was pending against him precluded a knowing waiver of his Sixth Amendment rights because it failed to communicate information necessary for an indicted defendant to "appreciate the gravity of his legal position" and "the urgency of his need for a lawyer's assistance"); *United States v. Satterfield*, 558 F.2d 655, 657 (2d Cir. 1976) (finding waiver to be involuntary where the defendant was "distraught, upset, weeping and obviously out of control at the initial questioning, still in great need of help at the later interview"); *contra United States v. Lord*, 565 F.2d 831, 839 (2d Cir. 1977) (holding that a defendant's pre-arraignment confession was voluntary).

Drawing inspiration from the late Judge Henry Friendly's dissent in *United States v. Massimo*, 432 F.2d 324 (2d Cir. 1970), in which he questioned the sufficiency of *Miranda* waivers in the Sixth Amendment context, *id.* at 327, the court of appeals ultimately inferred a "higher standard" of proof for waiver of the right to counsel under the Sixth Amendment than under the Fifth Amendment. *Mohabir*, 624 F.2d at 1147-48, 1151, 1153; *Carvey*, 611 F.2d at 22; *Satterfield*, 588 F.2d at 657. To survive a challenge to the validity of a post-indictment waiver under the court of appeals' enhanced criteria, the *Mohabir* court held that any waiver first "must be preceded by a federal judicial officer's explanation of the content and significance of this right." *Mohabir*, 624 F.2d at 1153. Additionally, the court ruled that

> a defendant arrested after indictment should be shown the indictment and told by the judicial officer that he has been indicted, the significance of an indictment, that he has a right to counsel, and the seriousness of his

situation in the event he should decide to answer questions of any law enforcement officers in the absence of counsel.

*Id.*

The *Mohabir* court considered "[t]he advantages of such a rule [to be] clear." *Id.* By requiring warnings to be given by a judicial officer instead of an agent of the law enforcement, the court believed that "disputes as to what occurred will be rare and legal battles as to" the sufficiency of a defendant's comprehension in support of a waiver finding "will be less likely." *Id.* Importantly, however, the court did not consider these directives to be mandated by the Sixth Amendment. Rather, the court predicated its decision upon an "exercise of [its] supervisory power." *Id.* Although the court understood that its ruling likely would result in a marked decrease in the number of confessions obtained from uncounseled, indicted defendants, it accepted that consequence as "the price of defining in a more precise way the 'higher standard' that must be met for waiver of the Sixth Amendment right." *Id.*[2]

In admonishing the Second Circuit for its exceptionally heavy-handed approach to testing waiver and rejecting the notion that the Sixth Amendment right to counsel is "superior" or "more difficult to waive than the Fifth Amendment counterpart," the *Patterson*

---

[2] Perhaps as a sign of restraint, the *Mohabir* court deliberately "put off until another day consideration of . . . simply 'outlawing' all statements following uncounseled waivers by indicted defendants," *Mohabir*, 624 F.2d at 1153, thus avoiding consideration of Judge Friendly's (admittedly extraconstitutional) prophylactic remedy. *See Massimo*, 432 F.2d at 327 (Friendly, J., dissenting) ("[I]n the case of a federal trial there would seem to be much ground for outlawing all statements resulting from post-arraignment or indictment interrogation (as distinguished from volunteered statements) in the absence of counsel when the questioning has no objective other than to establish the guilt of the accused, *even if the Sixth Amendment does not require so much*." (emphasis added)) (citing *Ricks v. United States*, 334 F.2d 964 (D.C. Cir. 1964)).

Court clarified that there is no hierarchy for assessing waivers of constitutional rights. *Patterson*, 487 U.S. at 297-98. Today's Majority interprets that critique as precluding the *per se* rule advanced by Rawls. Maj. Op. at 13.[3] But the United States Supreme Court long has recognized the value of some bright-line rules in the Sixth Amendment context, and *Patterson* acknowledged that "there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes" once a person is charged with a crime. *Patterson*, 487 U.S. at 296 n.9.

Significantly, the Supreme Court has held that law enforcement may not surreptitiously use a jailhouse informant or co-defendant to elicit incriminating admissions from a defendant because those tactics deliberately circumvent his right to have counsel present post-indictment. *Maine v. Moulton*, 474 U.S. 159, 176 (1985) (addressing co-defendants); *United States v. Henry*, 447 U.S. 264, 273-74 (1980) (addressing jailhouse informants). Nor can police trick a defendant into agreeing to talk by withholding from him the fact that his lawyer is trying to reach him, *Patterson*, 487 U.S. at 296 n.9 (citing *Moran v. Burbine*, 475 U.S. 412, 424, 428 (1986)), or by questioning him while he is isolated and in transit against the express wishes of defense counsel. *Brewer*, 430 U.S.

---

[3] The Majority also finds decisions from seven of the federal courts of appeals that have rejected Rawls' position to be persuasive. Maj. Op. at 10 & n.7. The persuasive value of these cases is questionable, at best, as a number of them involved defendants who were aware that they had been criminally charged when they waived their right to have counsel present during questioning by law enforcement. *See, e.g.*, *United States v. Charria*, 919 F.2d 842, 844 (2d Cir. 1990) (defendant was shown copy of arrest warrant indicating that he was under indictment for conspiracy to distribute cocaine and money laundering); *Riddick v. Edminston*, 894 F.2d 586, 588 (3d Cir. 1990) (defendant "signed a waiver of extradition on a form that stated he had been charged with murder in New Jersey"); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989) (defendant was "shown a copy of his arrest warrant, which stated that an information charging first degree murder had been filed").

at 399, 404-05.  In announcing bright-line rules favoring the continuous entitlement to counsel over investigatory strategies in these situations, the Court focused upon the particular sleights of mind used to subvert the defendants' awareness of their Sixth Amendment rights, whether or not formal attorney-client relationships existed at the time.

That inquiry is applicable here.  While endeavoring to secure Rawls' waiver, the interrogating officer, Agent Trent Peacock of the Williamsport Police Bureau, made a series of comments that seemed to downplay Rawls' culpability in order to overcome his reticence to speak.  *See* Notes of Testimony ("N.T."), Suppression Hearing, 4/26/2018, at 14, 36-40.  For ease of reference, the relevant portions of the transcript derived from the videotaped interrogation of Rawls, introduced at the suppression hearing as the Commonwealth's Exhibit-2, are reproduced below.  The scene begins with Rawls' introduction to the interrogating officers following his arrest:

| Agent Peacock: | You walked in here today to see us in regards to information that's been released in the media as you as a person of interest, correct? |
|---|---|
| Jordan Rawls: | Yes. |
| Agent Peacock: | Okay.  When you came in I placed you under arrest. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay.  And at this point you are not free to go. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay.  With that in mind, for us to discuss this incident, okay, I need to advise you of your rights, okay.  Are you good with that? |
| Jordan Rawls: | (Inaudible). |

| | |
|---|---|
| Agent Peacock: | Okay. Do you have any problem reading or writing? |
| Jordan Rawls: | No. |
| Agent Peacock: | Okay. And you can slide right up here. You can follow along. My name is Agent Peacock of the Williamsport Bureau of Police. I wish to advise you that you have an absolute right to remain silent. Anything you say can and will be used against you in a court of law. |
| | You have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney one will be appointed to represent you without any charge before questioning if you so desire. If you decide to answer any questions, you may stop at any time you wish. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Do you understand these rights I've explained to you? |
| Jordan Rawls: | Yes. |
| Agent Peacock: | If you understand them, I need yes and your initials on that line. Okay. With these rights in mind, do you wish to talk to me without having an attorney present? Obviously, you come in here to talk to me because you have an account of why you're on video and - - and - - |

Interrogation Tr., 11/11/2016, at 4-5.

Upon asking Rawls if he understood his rights—but before receiving his answer—

Agent Peacock suggested to Rawls that he "obviously" came to the police station to give

his "account." *Id.* at 5. Rawls immediately voiced his growing uncertainty:

| | |
|---|---|
| Jordan Rawls: | I'm actually kinda confused. I'm - - I'm like more confused. |
| Agent Peacock: | Okay. |

| | |
|---|---|
| Jordan Rawls: | That's why I really came in. |
| Agent Peacock: | Okay. And - - and at this point, okay -- |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | - - you understand we are investigating a criminal homicide by what's been released in - - in the news? |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | All right. Yeah. |
| Agent Peacock: | And based on the information we've received - - |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | - - okay, we have probable cause to obtain an arrest warrant. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Now, probable cause is not sufficient to convict you of any crimes, okay. Probable cause is sufficient to arrest you. |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | Okay. Is the burden of proof we need to arrest you, okay. |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | But in a courtroom we're gonna have to prove beyond a reasonable doubt - - |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | - - that you're guilty of any crimes. |

| | |
|---|---|
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | **So right now to get an arrest warrant it's a lower standard - -** |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | **- - than to find somebody guilty.** |
| Jordan Rawls: | Right. |
| Agent Peacock: | **Okay. And based on that lower standard - -** |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | **- - there may be some middle ground here, okay - -** |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | **- - that you're not the guy that did it.** |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | And that burden of proof is gonna be on us, okay. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | From a beyond a reasonable doubt standard. |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | Okay. |

*Id.* at 5-8 (emphasis added).

In an effort to reassure Rawls, in effect bolstering his confidence to answer questions without the assistance of counsel, Agent Peacock provided a CliffsNotes description of the different burdens of proof for obtaining an arrest warrant versus securing a conviction at trial. To hammer home his point that an arrest warrant requires a lower standard of proof than a guilty verdict, Agent Peacock suggested to Rawls that "there may be some middle ground here" between the two standards: Rawls might not be "the guy that did it." *Id.* at 7. In other words, Rawls might not have committed the double-homicide with which he already was charged, and for which Agent Peacock immediately took him into custody once Rawls voluntarily entered the police station. Color me incredulous.

Rawls then appears to parrot Agent Peacock's reference to "the guy that did it," still evidently unaware of the necessity of first waiving his *Miranda* rights:

| Jordan Rawls: | **The guy that - - that did - -** |
|---|---|
| Agent Peacock: | I can't ask you anything, okay. And I really don't want you to say anything at this point because any conversation, okay - - we can't really have a conversation without you understanding and being aware and waiving your rights. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | Yeah. I got it. All right. Okay. |
| Agent Peacock: | Do you wish to talk to us, understanding that you can stop at any time you wish, you don't have to answer questions if you choose not to answer questions, okay? |
| Jordan Rawls: | 'Uh - - |

| | |
|---|---|
| Agent Peacock: | **Do you want to give us your side of - - I believe - - I believe you have a side of the story that - - I don't suspect that you would have come bouncin' in here - -** |
| Jordan Rawls: | Uh-hum. |
| Agent Peacock: | **- - if you were the guy responsible for this.** |
| Jordan Rawls: | Listen, I don't got no problem answering any of y'all's questions. |
| Agent Peacock: | Okay. |
| Jordan Rawls: | Anything y'all, 'uh, feel like y'all need to ask me, go ahead and ask me. I'm - - |
| Agent Peacock: | Okay. |
| Jordan Rawls: | I'm comfortable with it. |
| Agent Peacock: | Okay. Then with these rights in mind do you wish to talk to us without having an attorney present? |
| Jordan Rawls: | Yes. Yeah. |
| Agent Peacock: | Okay. Go ahead, yes and your initials. By affixing your signature on this waiver you're acknowledging that you have read and understand the rights explained to you on this form. |
| Jordan Rawls: | Okay. |
| Agent Peacock: | Okay. If you understand them, go ahead and sign right there. Okay. . . . |

*Id.* at 8-9 (emphasis added). Once again, after asking Rawls if he wanted to talk—but before Rawls could answer—Agent Peacock interjected that he did not "suspect" that Rawls would have come "bouncin'" to the police station of his own volition if he actually had been "responsible for" the double-homicide. *Id.* at 8-9.

As the foregoing interaction reveals, Rawls ultimately agreed to waive his rights only after Agent Peacock twice responded to Rawls' reluctance and apparent confusion by intimating that Rawls might be innocent. In reality, Agent Peacock knew that Rawls was the prime suspect of the Commonwealth's investigation and had, in fact, been charged with two counts of criminal homicide the day before. Notwithstanding Rawls' reflexive "uh-hums" and "okays," on this record I am not confident that he truly understood the "full dangers and disadvantages of" waiving his right to counsel or that those risks adequately were explained to him. *Patterson*, 487 U.S. at 299-300. The problem here is particularly acute given the interrogating officer's attempt to assuage Rawls' concern with an abstract description of the burdens of proof at play, which is not a requirement of *Miranda* and may have been counterproductive.[4]

The Majority implicitly chalks up this rigmarole to run-of-the-mill police work—the kind of "police-citizen interaction[] that fall[s] short of overt coercion" and thus is constitutionally tolerable. Maj. Op. at 12 & n.9. Whatever minimal constitutional obligations Agent Peacock satisfied by accurately providing *Miranda* warnings, he undercut his efforts to secure a knowing and intelligent waiver of Rawls' Sixth Amendment

---

[4]     I, for one, would not presume that a layperson in Rawls' position meaningfully understands the difference between "probable cause" and "reasonable doubt"—to say nothing of the Commonwealth's burden to substantiate its charges with *prima facie* evidence in order to survive a preliminary hearing—without further explanation. Indeed, even experienced jurists occasionally falter when attempting to explain reasonable doubt to jurors in plain English. *See Cage v. Louisiana*, 498 U.S. 39, 41 (1990) (*per curiam*) (holding that a reasonable doubt jury instruction that "equated a reasonable doubt with 'grave uncertainty' and an 'actual substantial doubt,' . . . suggested a higher degree of doubt than is required for acquittal" in violation of federal due process principles); *accord Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). Nor is it likely that Rawls would have waived his right to counsel had he grasped the fact that he would not have been free to leave *regardless* of his candor with law enforcement from the get-go.

right to counsel by repeatedly downplaying Rawls' criminal liability thereafter, thereby providing him with a false sense a security about his exposure and need for a lawyer. That fact sets this case apart from the Fourth and Fifth Amendment contexts, in which the government has more leeway to withhold information from a suspect. Where the Sixth Amendment is concerned, however, psychologically coercive interrogation tactics run afoul of the Constitution when they are employed with the aim of subverting the decision to ask for counsel. For those reasons, a bright-line rule requiring would-be interrogators to inform defendants in clear terms that they formally had been charged with a crime when attempting to secure waivers is needed to preserve the fundamental right to counsel from undue pressures. Such a rule almost certainly would have sufficed to avoid the muddle that resulted from Agent Peacock's deception here.

While the Majority rightly acknowledges that we may take a different view if presented with an analogous claim under our organic Charter, Maj. Op. at 12, I am dismayed by the perpetuation of what the late Justice Arthur Goldberg long ago described as a system of criminal justice that has "come[] to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights." *Escobedo v. Illinois*, 378 U.S. 478, 490 (1964). The filing of formal charges categorically alters the dynamic between the accused and his government. "It is the starting point of our whole system of adversary criminal justice," the moment at which "a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby*, 406 U.S. at 689. If all that law enforcement must do to effectuate a waiver of the right to counsel under the Sixth Amendment is regurgitate *Miranda* warnings—even after misleading a defendant about

his legal risk—attachment would be reduced to "a mere formalism." *Id.* Where does that leave "the crucible of meaningful adversarial testing"? *United States v. Cronic*, 466 U.S. 648, 656 (1984).

Because the interrogation tactics employed in this case likely amplified Rawls' confusion regarding his legal jeopardy, *Miranda* warnings alone were inadequate to apprise him of the value of having an attorney present and "the consequences of abandoning those rights." *Patterson*, 487 U.S. at 296. Under these circumstances, I cannot agree that the waiver of his right to counsel under the Sixth Amendment was knowing or intelligent. Accordingly, I would vacate his conviction and remand for a new trial without the use of his uncounseled statements.